## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JANE DOE (J.S.H.), *an individual*,

     Plaintiff,

     v.

CHOICE HOTELS INTERNATIONAL, INC.
and GP4 PROPERTY OWNER, LLC,

     Defendants.

Civil Action No. 24-1598-TDC

## MEMORANDUM OPINION

Plaintiff Jane Doe has filed this civil action against Defendants Choice Hotels International, Inc. ("Choice") and GP4 Property Owner, LLC ("GP4"), in which she asserts claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581–1597, based on her allegation that she was a victim of sex trafficking by unidentified third parties at a hotel in Jacksonville, Florida owned and operated by GP4 and subject to a franchise agreement with Choice. Choice has filed a Motion to Transfer Venue or, in the Alternative, to Dismiss, and GP4 has filed a Motion to Dismiss based on a lack of personal jurisdiction, improper venue, and a failure to state a claim. After briefing, the Court held a hearing on the Motions on June 10, 2025. For the reasons set forth below, Choice's Motion will be GRANTED, and GP4's Motion will be GRANTED IN PART and DENIED IN PART, in that the Court finds a lack of personal jurisdiction over GP4 but will transfer the claims against it, and the entire case, to the United States District Court for the Middle District of Florida.

## BACKGROUND

I.    **Trafficking Allegations**

In the Complaint, Doe, a resident and citizen of Georgia, alleges that she was the victim of sex trafficking at the direction of unidentified traffickers ("the Individual Traffickers"). Specifically, Doe alleges that she was "trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts," and that she was trafficked "continuously from 2010 through November 30, 2016." Compl. ¶ 23, ECF No. 1.  Of particular relevance to this litigation, Doe alleges that, between June 2014 and October 2014, she was trafficked "an incalculable number of times" in rooms at the Suburban Extended Stay Hotel Bay Meadows located in Jacksonville, Florida ("the Suburban Bay Meadows"). *Id.* ¶¶ 23, 25.  During 2014, the Suburban Bay Meadows was owned and operated by GP4, a limited liability company based in Raleigh, North Carolina, as a franchise of Suburban Extended Stay, a hotel brand of Choice, a Delaware corporation and hotel franchisor with its principal place of business in North Bethesda, Maryland.

In this litigation, Doe brings claims under the TVPRA against Choice and GP4, a Choice franchisee, both of which Doe alleges "owned, operated, and controlled" the Suburban Bay Meadows. *Id.* ¶¶ 14–15.  Doe first alleges that Defendants had "actual and constructive knowledge" of her trafficking at the Suburban Bay Meadows. *Id.* ¶ 54.  In support of this allegation, Doe presents facts about the "widely known and pervasive" nature of hotel sex trafficking generally as well as the "endemic" nature of sex trafficking at Choice-branded hotels specifically. *Id.* ¶¶ 26, 40.  As to the nature of hotel sex trafficking generally, Doe alleges that "sex slavery is pervasive in the United States, and hotels are the primary place where it happens," citing statistics such as that, in 2014, "92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels," and asserting that, given this link,

"government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking." *Id.* ¶¶ 27–29. According to Doe, this "relationship between sex trafficking and the hotel industry necessarily shapes what [Defendants] knew or should have known regarding the trafficking at their hotel properties." *Id.* ¶ 26.

As to the nature of sex trafficking at Choice-branded hotels specifically, Doe asserts that Choice's "actual knowledge is *not* limited to general awareness of the problem of sex trafficking in the hotel industry." *Id.* ¶ 40. As to Choice, Doe alleges that it "monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including Suburban Bay Meadows." *Id.* ¶ 41. In support of this allegation, Doe primarily points to numerous online reviews left by customers of various Choice-branded hotels between 2006 and 2018 referencing the presence of prostitution and other illicit activities.

With respect to both Choice and GP4, Doe alleges that they were "specifically aware that sex trafficking was prevalent at the subject Suburban Bay Meadows." *Id.* ¶ 46. In support of this allegation, Doe asserts that Choice and GP4 "knew that [the Suburban Bay Meadows] was in a high-crime area with a known history of reports of sex trafficking," *id.* ¶ 47, and identifies two online reviews, published after the time period during which Doe was trafficked, referencing the presence of prostitution and other illicit activities at the Suburban Bay Meadows. First, a Yelp review dated May 21, 2015 stated:

> Avoid this hotel at any cost. It is a drug/lowlife/prostitute infested pit, it stinks, it's filthy, and I'm sorry I ever booked it. Don't believe the website photos . . . it is nothing like that in real life. The only hotel I've been in that was worse was one I was shot at in, and this is a very close second.

*Id.* ¶ 48. In addition, a Yelp review from April 8, 2018 stated:

3

> The place is more like a halfway house. It seems to be filled with drug dealers, prostitutes, and homeless people. The room was disgusting. If you are in the area and can't find another hotel, do yourself a favor and sleep in your car . . . .

*Id.*

Further, Doe alleges that GP4 "knew or was willfully blind to the fact of" her sex trafficking at the Suburban Bay Meadows because "there were obvious signs that her traffickers were engaged in sex trafficking" observed by Suburban Bay Meadows managers and employees. *Id.* ¶¶ 50–52. These signs included that the "hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards," "[o]ther girls were trafficked at the same hotel at the same time," Doe "asked for clean sheets and towels multiple times a day," there was "heavy foot traffic in and out of [Doe's] room involving men who were not hotel guests," and Doe "had around twenty (20) johns every day" who "entered and left at unusual hours and were present at the hotel for brief periods of time." *Id.* ¶ 50. Doe alleges that despite its knowledge of the sex trafficking involving Doe, GP4 facilitated it by continuing to "rent[] rooms to these traffickers, including the rooms used to sexually exploit victims," thereby "providing them a venue in the form of hotel rooms and related services." *Id.* ¶¶ 56–57.

Doe further alleges that GP4 facilitated her trafficking by (1) "allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking"; (2) "inadequate and inadequately enforced sex trafficking notice[s] and training for hotel staff"; (3) "choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures"; and (4) "implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of

taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff." *Id.* ¶ 58.

As for Choice, Doe alleges that Choice "knew or should have known" about the sex trafficking of Doe based on a policy that "required hotel staff to report suspected criminal activity including sex trafficking." *Id.* ¶ 53. Doe further asserts that Choice facilitated the trafficking of Doe by "retain[ing] control" over responses to sex trafficking at Choice-branded hotels, including the design, implementation, and enforcement of policies and practices to prevent or respond to trafficking, whether and how additional training was needed and provided, when information would be shared with law enforcement about suspected trafficking, and whether to terminate a franchise agreement or hotel staff because of trafficking. *Id.* ¶ 59. Choice also allegedly maintained a security team to investigate potential criminal incidents, including sex trafficking, as well as a hotline for franchisees and hotel staff to report suspected trafficking. Doe further alleges that Choice has such knowledge based on her claims that Choice maintained control over general policies and practices at Choice-branded hotels such as the Suburban Bay Meadows, including those relating to room reservations and rates, check-in, and payment processes; the provision of internet services; housekeeping services; and discount and reward programs, and because Choice allegedly maintained a "do not rent" system and maintained and analyzed data on hotel guests and housekeeping services. *Id.* ¶ 60.

Finally, Doe alleges that by engaging in these practices, Choice and GP4 participated in two distinct ventures with links to sex trafficking generally, and her sex trafficking specifically, from which Choice and GP4 benefited financially. First, Doe alleges that Choice and GP4 "knowingly benefited from engaging in a venture with sex traffickers at the subject Suburban Bay Meadows location" through which the Individual Traffickers engaged in violations of the TVPRA

by trafficking victims, including Doe, at the Suburban Bay Meadows. *Id.* ¶¶ 65, 65b. In turn, Choice and GP4 benefited from this trafficking, which they "knew or should have known about," by receiving payments as a result of the Individual Traffickers' room rentals. *Id.* ¶ 65b. Doe further alleges that this venture involved "a mutually beneficial relationship" between Defendants and the Individual Traffickers, who "frequently used the Suburban Bay Meadows location for their trafficking because of an implicit understanding" that there would be "minimal interference" and a "lower[ed] . . . risk of detection." *Id.* ¶¶ 65d, 65e.

Second, Doe alleges that Choice "also knowingly benefited from engaging in a commercial venture with" GP4 in "operating the Suburban Bay Meadows" in a way that facilitated sex trafficking "by keeping operating costs low, maintaining the loyalty" of sex traffickers, and "not acknowledging the pervasive nature of sex trafficking" at Choice-branded hotels generally and at the Suburban Bay Meadows specifically. *Id.* ¶ 66c. According to Doe, Choice benefited from this venture by receiving revenue from rooms rented to traffickers pursuant to the revenue sharing arrangement in the franchise agreement "[d]espite having actual or constructive knowledge" of the sex-trafficking at Suburban Bay Meadows. *Id.* ¶¶ 63a, 66e.

## II.    The Complaint

On June 3, 2024, Doe filed the presently operative three-count Complaint. In Count 1, Doe asserts a claim against GP4 for "perpetrator liability" under the TVPRA based on the allegation that GP4 "harbored individuals (including [Doe]) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts" while at the Suburban Bay Meadows, and "knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in" such violations, in violation of 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), and § 1595. *Id.* ¶ 75. In Count 2, Doe asserts a claim against

both Choice and GP4 for "beneficiary liability" under the TVPRA, in that they "received a financial benefit from participating in a venture with traffickers, including [Doe's] traffickers, despite the fact that each defendant knew or should have known that these traffickers . . . were engaged in violations of" the TVPRA, and that Choice "received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though" Choice "knew or should have known that this venture was violating" the TVPRA, all in violation of 18 U.S.C §§ 1591(a) and 1595(a). *Id.* ¶¶ 79–80. In Count 3, Doe asserts a claim against Choice for vicarious liability for GP4's TVPRA violations in Counts 1 and 2.

## DISCUSSION

In its Motion, GP4 seeks dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), improper venue pursuant to Rule 12(b)(3), and failure to state a claim pursuant to Rule 12(b)(6). Choice separately seeks dismissal for improper venue pursuant to Rule 12(b)(3) or, in the alternative, argues pursuant to 28 U.S.C. § 1404 that the case should transferred to the United States District Court for the Middle District of Florida. Choice also seeks dismissal of the counts against it for failure to state a claim pursuant to Rule 12(b)(6).

### I.   Personal Jurisdiction

The Court first addresses the argument by GP4, a limited liability company established under the laws of Delaware with its principal place of business in North Carolina, that the claims against GP4 should be dismissed for lack of personal jurisdiction because the Court lacks either general or specific jurisdiction over it.

## A.    Legal Standards

It is the plaintiff's burden to establish personal jurisdiction. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993). To carry that burden at the pleading stage, the plaintiff need only make a *prima facie* showing that a defendant is properly subject to this Court's jurisdiction. *Id.* In evaluating the plaintiff's showing, this Court must accept the plaintiff's allegations as true, and it must draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor. *Id.* The Court may consider evidence outside the pleadings in resolving a Rule 12(b)(2) motion. *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d. 757, 763-64 (D. Md. 2009).

A district court's exercise of personal jurisdiction over a non-resident defendant must satisfy both the long-arm statute of the state in which the court sits and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Because the parties in this case assert that the "inquiry under Maryland's long-arm statute should collapse with the constitutional inquiry" and thus do not brief the statutory inquiry, the Court will address only the constitutional inquiry. Opp'n to GP4 Mot. at 19, ECF No. 41-3.

Under the Due Process Clause of the Fourteenth Amendment, personal jurisdiction may be exercised over a party upon a showing that the party has sufficient "minimum contacts" with the forum state such that "maintenance of the suit [in the state] does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In assessing the presence of minimum contacts, courts distinguish between two types of personal jurisdiction: general and specific. Where it is undisputed that GP4 is not a citizen of Maryland,

GP4 argues, and Doe does not dispute, that this Court lacks general jurisdiction over it. Accordingly, the Court's analysis will be limited to whether there is specific jurisdiction over GP4.

Specific, or case-linked, jurisdiction provides authority "over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). For a court to exercise specific jurisdiction over a defendant, the defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State," and its "conduct and connection with the forum State" must be "such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Court determines if it has specific jurisdiction over an entity by considering "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc.*, 293 F.3d at 712). The Court will examine each element in turn.

**B.    "Purposefully Availed"**

The United States Court of Appeals for the Fourth Circuit has stated that the purposeful availment inquiry "is not susceptible to a mechanical application" and has identified a list of non-exclusive factors to be considered in the analysis:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and

(8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198-99 (4th Cir. 2018)). In assessing this element, courts consider "the *quality* and *nature* of the defendant's connections" to the forum state, "not merely the number of contacts between the defendant and the forum state." *Id.* In determining whether out-of-state defendants purposefully availed themselves of the privilege of doing business in the forum state, a court is "entitled to accord special weight to the fact that" the out-of-state defendant initiated contact with the plaintiff in the forum state. *CFA Inst. v. Fin. Analysts of India*, 551 F.3d 285, 295 n.17 (4th Cir. 2009).

Here, the parties do not dispute that GP4 has purposefully availed itself of the privilege of conducting activities in Maryland by virtue of the facts that it entered into a franchise agreement with Choice, a Maryland-based corporation, and that the agreement was signed in Maryland. The United States Supreme Court has found such purposeful availment under similar circumstances. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479–80 (1985) (holding that a Michigan franchisee had purposefully availed itself of the privilege of doing business in Florida where it had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise" and thus received "the manifold benefits that would derive from affiliation with a nationwide organization" and voluntarily accepted "the long-term and exacting regulation of his business from Burger King's Miami headquarters"); *see also Econo Lodges Int'l, Inc. v. Peck* ("*Econo Lodges*"), No. 93-1519, 1993 WL 369262, at *2 (4th Cir. Sept. 22, 1993) (unpublished) (holding that a Florida hotel franchisee had purposefully availed itself of the privilege of doing business in North Carolina by entering into a franchise agreement with a

franchisor, Econo Lodges International, Inc., whose principal place of business was in North Carolina). This prong is satisfied.

### C.    "Arise Out of or Relate to the Defendant's Contacts"

The second due process requirement is that the plaintiff's claims must "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017)); *see Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 139 (4th Cir. 2020) (concluding that Marriott's significant activities relating to multiple hotels in South Carolina were not sufficient to establish personal jurisdiction there when those activities had "nothing to do with the claims asserted by the Plaintiffs" of negligence arising from injuries sustained at a Marriott-affiliated hotel in Italy). This standard does not mean "that only a strict causal relationship between the defendant's in-state activity and the litigation will do," as "some relationships will support jurisdiction without a causal showing." *Ford Motor Co.*, 141 S. Ct. at 1026. Still, the standard "does not mean anything goes." *Id.* "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

As an initial matter, Doe relies heavily, if not exclusively, upon GP4's franchise agreement with Choice as the key contact to establish relatedness. Doe's claims against GP4, however, do not directly arise from the franchise agreement in that Doe does not allege a breach of that agreement. This case is thus distinguishable from *Burger King* and *Econo Lodges*, in which specific jurisdiction was established over a franchisee in the franchisor's home state when the claims centered on breaches of the franchise agreements themselves. *See Burger King Corp.*, 471 U.S. at 468–69, 480; *Econo Lodges*, 1993 WL 369262, at *1–2; *see also Madden v. Petland*

11

*Summerville, LLC*, No. 20-CV-02953-DCN, 2021 WL 288370, at *4 (D.S.C. Jan. 28, 2021) (rejecting the argument that the "single act of entering a long-term franchise agreement . . . is sufficient to establish specific personal jurisdiction" and collecting cases). Notably, the franchise agreement does not reference any policies or procedures relating to combating sex trafficking or mention sex trafficking in any way.

Perhaps recognizing this issue, Doe does not directly rely on the agreement itself but instead argues that her claims relate to certain contacts arising out of the franchise agreement. Doe broadly argues that the TVPRA claims relate to GP4's Maryland contacts because GP4's rental of rooms to the traffickers and operation of the Suburban Bay Meadows in a way that facilitated trafficking related to the statutory element of a "venture" between Choice, GP4, and the Individual Traffickers. Doe also references GP4's routine interactions with Choice as part of the franchise arrangement, including Choice's establishment of national policies and procedures relating to hotel operations and the use of Choice's Maryland-based national reservation and payment systems, as related to the business "venture" between GP4 and Choice alleged in the Complaint to be part of the TVPRA violations. Finally, Doe asserts that GP4's Maryland contacts relate to the TVPRA requirement of having "knowingly benefited" from sex trafficking because "the traffickers' payments for rooms were processed through Maryland systems," "Choice, from Maryland, accepted payments for some rooms," Opp'n to GP4 Mot. at 23, and GP4 sent revenue generated from the traffickers to Maryland at a rate set by the franchise agreement.

The Court finds that these alleged contacts are not sufficient to show that Doe's claims against GP4 "arise out of or relate to" its contacts with Maryland. *Ford Motor Co.*, 141 S. Ct. at 1026. First, to the extent that Doe relies on actions undertaken by Choice, such as setting national policies and establishing the percentage of revenue required to be paid to Choice, whether pursuant

to the franchise agreement or not, Choice's own actions in Maryland cannot support a finding of personal jurisdiction over GP4 because such jurisdiction must be established on the basis of each defendant's own contacts with a forum. *See Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1783 (2017).

Second, several of these identified factors, such as GP4's renting of rooms to traffickers, the operation of the Suburban Bay Meadows in a manner that facilitated trafficking, and the alleged following of Choice's national policies, all occurred in Florida and do not constitute contacts with Maryland. To the extent that Doe appears to argue that these actions are linked to a sex trafficking venture by a Choice policy relating to trafficking, the franchise agreement never mentions sex trafficking at any point and thus does not establish or even reference any policies or procedures relating to detecting, addressing, or reporting sex trafficking. Likewise, as represented at the hearing, the "rules and regulations" referenced in the franchise agreement do not reference sex trafficking. Hrg. Tr. at 16–17, ECF No. 66.

Third, as to the allegations relating to payments sent to Maryland, neither the Complaint nor any additional information submitted in relation to the Motion provides any facts about any actual payments from traffickers being sent to or processed in Maryland. Rather, the franchise agreement contradicts these claims in that it did not require remittance to Maryland of room revenues from specific transactions, and the Complaint actually alleges that the traffickers often paid in cash. Thus, the only payments sent by GP4 to Maryland were the standard monthly payments of fees consisting of a single-digit percentage of gross room revenues for the month. Franchise Agreement ¶ 4, ECF No. 57. Necessarily, GP4's alleged "benefit" from the sex trafficking was not included in any of the franchise fee payments sent to Maryland.

The general payment of monthly franchise fees, as well as other general contacts such as GP4's use of Choice's national reservation system, consist of a franchisee's routine interactions with a franchisor as part of the operation of a franchise hotel. The Court will not find that such standard contacts between a franchisor and franchisee are sufficient to satisfy the relatedness prong. Even when there is some arguable or general relationship between a claim and a franchisee's agreement or business relationship with its franchisor, courts within the Fourth Circuit have rejected claims of personal jurisdiction in the absence of a specific connection between the plaintiff's claim and the defendant's forum state contacts. For example, in *Sant v. Marriott Int'l, Inc.*, No. 22-1036-GJH, 2023 WL 2213926 (D. Md. Feb. 24, 2023), in which the plaintiff asserted a negligence claim arising out of a slip-and-fall at an India-based franchisee's Marriott hotel in India, the court held that it did not have personal jurisdiction over the franchisee in Maryland, where Marriott is based, because the claim did not arise out of the franchise agreement, even though that agreement generally allowed Marriott to exercise control over all aspects of the hotel. *Id.* at *1, *6–7.

In *Madden*, the court held that it lacked personal jurisdiction over an out-of-state franchisor for a negligence claim arising from a purchase from an in-state pet store franchisee of dogs that later developed unanticipated illnesses because the franchisee's alleged sale of unhealthy puppies was "far removed from [the franchisor's] franchise agreement," even though that agreement required the franchisees to purchase puppies from "breeders that meet certain minimum criteria," which the court deemed "typical of a franchisor-franchisee relationship." *Madden*, 2021 WL 288370, at *1, *5 & n.1. Relatedly, in *Ochua v. Cinthia's Bakery*, LLC, No. 19-03248-JMC, 2020 WL 374462 (D. Md. Jan. 23, 2020), the court concluded that the plaintiff, a delivery worker who asserted a negligence claim against a Virginia restaurant arising from an injury incurred while

delivering supplies to the restaurant on behalf of his Maryland-based employer, had not established that there was personal jurisdiction in Maryland over the restaurant because even though his delivery visit was the result of the business relationship between the restaurant and the Maryland supplier, the plaintiff's tort claim was "entirely unrelated to any contractual relationship between" the restaurant and his employer. *Id.* at *1, *4. As these cases illustrate, the existence of some arguable nexus between a claim and a defendant's business relationship with a franchisor or some other in-state business is not sufficient to show that the claim arises out of or is related to that business relationship.

The lack of sufficient relatedness in the present case is more specifically illustrated upon consideration of *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085 (Cal. 1996), cited by Doe. In *Vons*, the California Supreme Court considered "whether California courts may exercise personal jurisdiction over owners of 'fast food' restaurant franchises located in another state" in a case in which Vons, a California-based meat supplier, filed civil claims in a California court against Foodmaker, Inc., a California-based franchisor of Jack-in-the-Box restaurants to which Vons had sold meat, and several Jack-in-the-Box franchisees located in Washington state arising from incidents of bacterial contamination of hamburgers made with that meat at their restaurants. *Id.* at 1089. The court found personal jurisdiction in California over the Washington franchisees because (1) their franchise agreements with Foodmaker, which were negotiated and signed in California, included requirements governing which meat suppliers they could use, pursuant to which the franchisees purchased all of their hamburger patties from Foodmaker and sent payments for the meat to California; and (2) the franchise agreements established "uniform standards" for the cooking of the meat, which were allegedly "a source of injury" to the plaintiff, who claimed that the standards "were systematically deficient when measured by industry standards." *Id.* at

1089–90, 1099–1100 (citation omitted). Because the franchisees effectively bought the contaminated meat from the franchisor pursuant to the franchise agreements, and the claim that they undercooked the meat directly implicated the franchise agreements' standards for cooking of meat, the court found that the plaintiff's claims "arose out of" the franchise agreement, which was substantially connected to California. *Id.* at 1100.

By focusing on specific links between the plaintiff's claims and certain provisions of the franchise agreements, *Vons* highlights the deficiencies in Doe's personal jurisdiction argument. It was not enough that the franchisees engaged in regular business interactions with their California franchisor, which presumably would have included sending franchise fees derived from food sales to California or using marketing materials provided from California by the franchisor. Notably, while the finding of personal jurisdiction in *Vons* was dependent on the fact that the plaintiffs' claims directly related to the meat purchased from the California franchisor and cooked pursuant to standards set in the franchise agreement signed in California, here, Doe has identified no such connection. Although Doe's claim alleges that GP4 is liable for sex trafficking at the Suburban Bay Meadows, there is no part of the franchise agreement that addresses sex trafficking in any way, and there was no comparable product associated with sex trafficking that was the subject of specific purchase and use requirements set forth in the franchise agreement.

In another case cited by Doe, a federal district court, citing *Vons*, concluded that the plaintiffs' claims against California franchisee defendants that their high pressure tactics in selling DirectBuy memberships at in-person sales presentations violated state consumer protection laws were related to their contacts with their Indiana franchisor DirectBuy because the tactics used, including the use of a video prepared by DirectBuy and a policy that attendees who leave a sales presentation without purchasing a membership cannot join DirectBuy for seven years, were "in

conformity" with the franchisor's comprehensive system developed in Indiana. *See Ganezer v. DirectBuy, Inc.*, No. 08-8666-GAF, 2012 WL 12867971, at *1, *4 (C.D. Cal. Jan. 30, 2012). Again, the plaintiff's claims were related to the franchise agreement and the contacts with the franchisor in its home state because the acts in question—selling DirectBuy memberships—were conducted pursuant to policies and procedures established by the franchisor. Here, the sex trafficking at the Suburban Bay Meadows, or even the conduct of failing to stop it, was not undertaken by GP4 pursuant to or in a manner consistent with any part of the franchise agreement or any policy adopted in furtherance of that agreement. Rather, GP4's alleged liability for sex trafficking is based on its own conduct at its hotel in Florida.

The reference to allegations that GP4 and Choice were engaged in a "venture," as required by the TVPRA, does not change the analysis. Where there is nothing in the franchise agreement that directly or indirectly references a venture involving sex trafficking, and there are no allegations of contacts by GP4 with Maryland in furtherance of any such venture that are specific to sex trafficking or go beyond generic business interactions, the Court does not find that this allegation transforms Doe's claims against GP4 into claims sufficiently related to its contacts with Maryland to support personal jurisdiction. Notably, in *Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012), in which an American tire producer alleged that two foreign companies engaged in a conspiracy with its former employee to infringe on its copyrights and steal its tire designs, the Fourth Circuit found personal jurisdiction in Virginia over the defendants where a representative of one of the companies met with the plaintiff's former employee in Virginia to discuss the scheme and the other defendant engaged in repeated later communications with that employee relating to the scheme. *Id.* The court found that the claims arose out of those contacts based on the principle that this standard is met when

"substantial correspondence and collaboration between the parties, one of which is based in the forum state, form[ed] an important part of the claim." *Id.* at 303, 306. Although specific correspondence into the forum state about a conspiracy or venture is not necessarily required to establish that such a claim arose from contacts with that state, here, there are no allegations of any correspondence or other communications between GP4 and Choice while in Maryland that in any way relate to sex trafficking.

Finally, Doe's citation to *Doe v. G6 Hospitality, LLC*, No. 23-0198-MJT (E.D. Tex. filed Nov. 3, 2023), and similar cases before the same judge, which appear to constitute the only instances in which a court evaluating TVPRA claims similar to those asserted here has concluded that personal jurisdiction exists over a non-resident hotel franchisee in the franchisor's forum state, does not alter this conclusion. *Cf. J.N.K. v. Red Roof Inns*, No. 24-0389-ALM, 2025 WL 772150, at *7 (S.D. Ohio Mar. 11, 2025) (in addressing a motion to transfer venue, generally stating, without explanation, that a trafficking victim's claims against a hotel franchisee "arose out of" the franchisee's contacts with the franchisor's home state). In *G6 Hospitality, LLC*, the court found that personal jurisdiction existed in Texas, in which the franchisor was based, over a Motel 6 franchisee which allegedly permitted sex trafficking at its hotel in Georgia based on the facts that: (1) rental payments by the plaintiff's traffickers were processed through the franchisor's system in Texas; (2) the franchisee's "cut" of the payments was "determined by the Texas-law governed franchising agreement"; and (3) the franchisee allegedly engaged in a "venture" by knowingly allowing traffickers to rent rooms and creating a "favorable environment for trafficking," which was "allegedly in tension" with the franchisor's policies "regarding criminal activity and human trafficking." *G6 Hospitality, LLC*, No. 23-0198-MJT, slip op. at 16–17 (E.D. Tex. Sept. 30, 2024) (Dkt. No. 68).

18

Here, however, as discussed above, the facts differ in that the claim that the traffickers' payments were processed in Maryland is contradicted by the franchise agreement, and GP4's franchise agreement does not address human trafficking in any way. Further, the Court does not agree that when a franchisee acts in relation to its own hotel not in accordance with a franchise agreement or franchisor's policy, but contrary to such a policy or in the absence of a policy that could have been established by the franchisor, claims based on the franchisee's conduct must be deemed to arise from or relate to the franchise agreement or policy. In particular, it does not agree that a franchisee's alleged participation in criminal activity at its hotel is related to a franchise agreement simply because the agreement includes a general policy against criminal activity or, as discussed above, that a franchisee's regular monthly franchise fee payments to the franchisor are sufficient to support a finding that a plaintiff's claims arise from or are related to contacts with the franchisor's home state. Such conclusions underlying Doe's theory of personal jurisdiction would sweep too far in that they would effectively establish personal jurisdiction in the franchisor's home forum over any claim against a franchisee that alleges illegal conduct at a franchisee's hotel, or that relates in some way to a paying hotel guest at a franchisee's hotel. That has never been the law and would expand personal jurisdiction over franchisees in the franchisor's home state markedly beyond present limits.

In summary, the Court concludes that Doe has failed to demonstrate that her claims against GP4 arise out of or relate to GP4's contacts with Maryland and thus finds a lack of personal jurisdiction over GP4 on these claims. The Court therefore need not and will not address the third prong of the personal jurisdiction inquiry. *Consulting Eng'rs Corp.*, 561 F.3d at 279 ("If the plaintiff satisfies prongs one and two, prong three comes into play.").

Although Doe alternatively requests jurisdictional discovery relating to personal jurisdiction, the franchise agreement has already been produced to Doe and does not reveal a basis for personal jurisdiction, and Doe has not articulated any basis to conclude that there are additional materials that would reveal new contacts relating to sex trafficking that would alter the Court's conclusion. Accordingly, the Court will not grant the request for jurisdictional discovery. *See Carefirst of Md., Inc.*, 334 F.3d at 402 (stating that a court may deny jurisdictional discovery when "a plaintiff offers only speculation or conclusory assertions about contacts with a forum state").

Given the Court's conclusion that there is no personal jurisdiction over GP4, the Court need not address the remaining arguments in GP4's Motion.

## II.    Transfer of Venue

In its Motion, Choice seeks transfer of this case to the United States District Court for the Middle District of Florida based on improper venue under 28 U.S.C. § 1406 or for the convenience of the parties under 28 U.S.C. § 1404, or dismissal for failure to state a claim. In light of the Court's finding that it lacks personal jurisdiction over GP4, the Court notes that Doe cannot establish that the District of Maryland is a proper venue under 28 U.S.C. § 1391(b)(1) because that provision authorizes venue in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located," *id.*, and a defendant that is an entity is only deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question," 28 U.S.C. § 1391(c)(2). Where GP4 is not subject to this Court's personal jurisdiction and thus does not reside in this District, venue is not proper pursuant to 28 U.S.C. § 1391(b)(1).

As for whether venue is proper under § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the District of Maryland, the Court notes that

the primary events underlying the sex trafficking claims occurred in the Middle District of Florida, as the actual trafficking occurred at the Suburban Bay Meadows in Jacksonville, Florida, and GP4's alleged failure to prevent such trafficking also occurred at the hotel. Further, as stated at the hearing, to the extent that Choice failed to act to prevent it, it had area directors who were likely located in Florida and were primarily responsible for any franchisor activities relating to the Suburban Bay Meadows. Although it does not appear that "a substantial part of the events or omissions" underlying the claim occurred in Maryland, the Court need not decide that question because, as discussed below, it finds that transfer to the Middle District of Florida is warranted under 28 U.S.C. § 1404.

Under that provision, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Ordinarily, to prevail on a motion under § 1404(a), the moving party "must show by a preponderance of the evidence that the proposed transfer will better and more conveniently serve the interests of the parties and witnesses and better promote the interests of justice." *Helsel v. Tishman Realty & Constr. Co., Inc.*, 198 F. Supp. 2d 710, 711 (D. Md. 2002). The Court weighs a number of case-specific factors in making this determination, including: (1) the weight accorded to the plaintiff's choice of forum; (2) witness convenience and access to sources of proof; (3) the convenience of the parties; and (4) the interest of justice. *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.* ("*Trustees*"), 791 F.3d 436, 444 (4th Cir. 2015). In deciding a motion to transfer, a court may consider materials outside the pleadings. *See Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.3d 633, 645 (2d Cir. 1956) (*forum non conveniens*); *Huang v. Napolitano*, 721 F. Supp. 2d 46, 47 n.2 (D.D.C. 2010); *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 2d 172, 176 (E.D.N.Y. 2003). Doe does not dispute

that this case could have been brought in the Middle District of Florida, and venue is clearly proper in that District because, as discussed above, "a substantial part of the events or omissions giving rise to the claim occurred" at the Suburban Bay Meadows. 28 U.S.C. § 1391(b)(2). The Court therefore addresses the relevant § 1404 factors.

### A.    Plaintiff's Choice of Forum

Turning to the first factor, the plaintiff's choice of forum, the general rule is that the plaintiff's preference is afforded "substantial weight in determining whether transfer is appropriate." *Trustees*, 791 F.3d at 444. The deference accorded to the plaintiff's choice of forum should be proportional to the relationship between the forum and the cause of action and is lower when the plaintiff is not citizen of the state or the case does not otherwise have "significant ties" to the forum. *See Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237–38 (2d Cir. 2004) (affirming the district court's venue determination based in part on the conclusion that the weight accorded to the plaintiff's choice of forum was "diminished" because the cause of action did not have "significant ties" to that forum); *Bannister v. Wal-Mart Stores East, L.P.*, 843 F. Supp. 2d 610, 615 (E.D.N.C. 2012) (according lesser weight to the choice of forum because the plaintiffs were not residents of the forum state and alleged discrimination at their workplace in a different state).

Although Doe chose to file this case in the District of Maryland, Choice argues that this selection should be accorded little weight because Doe is not a resident of Maryland and her causes of action arise from acts that allegedly occurred entirely in Florida. While the Court agrees that the primary events underlying this case occurred in Florida, Doe's claims against Choice specifically involve certain omissions by Choice that likely occurred in Maryland. Other courts have concluded that decisionmaking relevant to a plaintiff's TVPRA claims against a hotel

franchisor occurred at the franchisor's headquarters in the forum state. *See, e.g.*, *J.N.K.*, No. 24-0389-ALM, at *7. While this case therefore has a sufficient connection to the District of Maryland such that this factor technically weighs in the plaintiff's favor, where the trafficking at the center of this litigation took place in Florida, and where Doe is not a resident of Maryland, the Court finds that this factor is not entitled to substantial weight. *See Bannister*, 843 F. Supp. 2d at 615.

### B.   Witness Convenience

The second factor, witness convenience, is "perhaps the most important factor" in determining whether a transfer of venue should be granted. *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 473 (D. Md. 2008) (quoting *Cronos Containers Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000)). This factor protects witnesses from unnecessary travel, expenditures of time, and expenses. *See id.* at 474. On this factor, "mere assertions of inconvenience or hardship are inadequate"; rather, movants must detail the specific hardships that witnesses will suffer by proceeding in the plaintiff's chosen venue. *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002).

Choice asserts that virtually all of the relevant witnesses, including "hotel staff, the alleged traffickers, or knowledgeable law enforcement personnel," are likely located in or near the Middle District of Florida, where the Suburban Bay Meadows is located. Choice Mot. at 10, ECF No. 36-1. Where this case cannot be proven without demonstrating both that Doe was trafficked at the Suburban Bay Meadows, and that GP4 and its staff knew or should have known of the trafficking based on the facts and circumstances present at the hotel during the trafficking, the Court agrees that the primary witnesses necessarily include individuals who were present in the Middle District of Florida at the time of the events in question. In addition to Suburban Bay Meadows hotel staff and law enforcement, Choice area directors with responsibility for oversight over that hotel were also likely located within the same region. Although Doe argues that Choice has not actually

identified specific witnesses by name, and that with the passage of time these individuals may no longer reside in the area, Choice has been unable to identify specific witnesses and ascertain their present locations because Doe's identity, and thus the key facts about the trafficking incidents, had not yet been disclosed to Choice at the time of the filing of the Motions, and it is significantly more likely that these witnesses remain in that area rather than having relocated to the Maryland area or beyond.

Significantly, the witnesses with knowledge of the trafficking activities would include many non-party witnesses, who could not be subpoenaed for depositions or trial in Maryland if they are presently located in or near Florida. *See* Fed. R. Civ. P. 45(c)(1) (stating that a subpoena "may command a person to attend a trial, hearing, or deposition only," as relevant here, when the proceeding will occur "within the state," or "within 100 miles of," "where the person resides, is employed, or regularly transacts business in person"). Although Doe notes that Choice personnel, who are relevant to her claims against Choice, are located in Maryland, such witnesses are party witnesses who would likely be available to testify in the Middle District of Florida, and as employees of a large corporation, the inconvenience to them of travel would likely be far less than for non-party witnesses asked to travel to Maryland. *See D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 782 (D. Md. 2009) ("Inconvenience to party witnesses is given less weight than inconvenience to non-party witnesses because the former are 'presumed to be more willing to testify in a different forum[.]'" (quoting *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 718 (E.D. Va. 2005))). Accordingly, the Court concludes that the witness convenience factor weighs in favor of transfer.

### C.    Convenience of the Parties

The next factor is whether the convenience of the parties to the litigation counsels in favor

of transfer.  In many cases, transferring a case would merely "shift the balance of inconvenience"

from one party to another.  *See Bd. of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating*

*& Air Conditioning, Inc.*, 702 F. Supp. 1253, 1258 (E.D. Va. 1988).  That is generally the case

here.  Although Choice is located in Maryland, Doe is a resident of Georgia and thus is closer to

Florida.  However, where these parties are arguing in favor of conducting the case in the forum

more distant from their states of residence, the convenience to these parties is not a significant

consideration.  As for GP4, while it formerly operated the Suburban Bay Meadows and thus would

presumably have stronger ties to the Middle District of Florida, it has reported that it no longer

owns businesses in Florida, and it has its principal place of business in North Carolina, so it appears

that neither forum is particularly convenient or more inconvenient than the other.  Thus, the Court

concludes that this factor does not favor transfer.

### D.    Interests of Justice

Finally, in addressing the factor of the interests of justice, Choice asserts that this dispute

is, at its essence, a local controversy in Florida that should be decided "at home," and that the

Middle District of Florida and the United States Court of Appeals for the Eleventh Circuit have

heard "numerous, similar TVPRA cases."  Choice Mot. at 11–12.  Doe responds that Maryland

also has an interest "in regulating the conduct of Choice," a corporation based in Maryland.  Opp'n

to Choice Mot. at 28, ECF No. 38.  Further, Doe asserts that there is a "strong public interest in

keeping this litigation in this District because it is [the] only venue that allows for the possibility

of centralizing TVPRA cases against Choice."  *Id.* at 28.

Here, as discussed above, the Court concludes that this case has relatively stronger ties to Florida, where the sex trafficking actually occurred, than to Maryland. More importantly, the Court finds that its lack of personal jurisdiction over GP4, a key party in this litigation, strongly counsels in favor of transferring this case to the Middle District of Florida, a proper venue where, as acknowledged at the hearing by Defendants, personal jurisdiction would exist over both GP4 and Choice. *See, e.g., E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 433–34 (N.D. Tex. 2021) (collecting cases concluding that personal jurisdiction exists over out-of-state franchisors in the judicial district where the trafficking took place). Having the claims in this case proceed in two different districts would be highly inefficient and incompatible with interests of judicial economy. Indeed, at the hearing, Doe's counsel stated that if the claims against GP4 cannot proceed in this District, it would prefer to have the entire case transferred to the same district rather than have the claims proceed in two separate cases. The Court therefore concludes that the interests of justice weigh strongly in favor of transferring this case. *See Aphena Pharma Sols.-Maryland LLC v. BioZone Laboratories, Inc.*, 912 F. Supp. 2d 309, 320–21 (D. Md. 2012) (concluding that, where the court held that it did not have personal jurisdiction over one of three defendants, the interests of justice "strongly favor transfer," even where "the other factors are either evenly balanced or favor retaining the case," to advance judicial economy by keeping all defendants in a single case).

In summary, where Doe's choice of forum is not entitled to substantial weight, the most important factor of witness convenience weighs in favor of transfer, and the interests of justice weigh strongly in favor of transferring the case, the Court will transfer this case to the Middle District of Florida pursuant to 28 U.S.C. § 1404.

The Court therefore need not and will not address Choice's arguments for dismissal for failure to state a claim under Rule 12(b)(6), which may be reasserted after transfer.

## CONCLUSION

For the foregoing reasons, GP4's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that the Court finds that it lacks personal jurisdiction over GP4 but will transfer the claims against it to the United States District Court for the Middle District of Florida, and Choice's Motion to Transfer Venue or, in the Alternative, to Dismiss will be GRANTED in that the claims against Choice, and thus the entire case, will be transferred to the Middle District of Florida. The Court will not resolve Defendants' arguments for dismissal for failure to state a claim, which may be considered after transfer. A separate Order shall issue.


Date:   July 28, 2025

THEODORE D. CHUANG
United States District Judge